UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------
TRAVIS D'ARIENZO, *individually and as a shareholder on behalf of Mermaid Market and Catering, Inc.*,

                          Plaintiff,

                v.

THE FIRE ISLAND NATIONAL SEASHORE ("FINS"), ALEX ROMERO, *in his official capacity as the Superintendent of FINS and as its Administrator of permits issued by FINS*, and SONIA TIANA, *an employee of FINS charged with issuance of federally regulated driving permits*,

                        Defendants.
--------------------------------------------------------------

**MEMORANDUM & ORDER**
20-CV-6330 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Travis D'Arienzo, individually and as a shareholder on behalf of Mermaid

Market and Catering, Inc. ("Mermaid Market"), commenced this action on December 29, 2020,

against the Fire Island National Seashore ("FINS"), an agency of the United States, Alex

Romero, in his official capacity as Superintendent of FINS, and Sonia Taiani,[1] an employee of

FINS.  (Compl., Docket Entry No. 1.)  Plaintiff asserts a claim under the Administrative

Procedure Act, 5 U.S.C. § 701 *et seq.* (the "APA") and seeks declaratory and injunctive relief in

connection with Defendants' denial of his driving permit.  (*Id.* at 7.)

---

      [1]  Defendant Taiani's name has been spelled inconsistently in the parties' briefing as "Tiana" and the administrative record as "Taiani."  The Court spells her name as "Taiani," consistent with the spelling in her declaration certifying the administrative record.  (Certified Administrative Record ("R."), Docket Entry No. 16.)

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure, and Plaintiff opposes the motion.[2]  For the reasons set forth below, the Court

grants Defendants' motion for summary judgment.

**I.   Background**

**a.   Plaintiff's driving permits**

Plaintiff owns Mermaid Market in Ocean Beach, Fire Island.  (R. 1.)  Access to Ocean

Beach and other communities on Fire Island is available by ferry or by driving a motor vehicle

across a bridge and along a designated off-road route through protected Fire Island National

Seashore land (the "Seashore").  16 U.S.C. § 459e; 36 C.F.R. § 7.20(a); *Friends of Animals v.

Fellner*, No. 16-CV-6006, 2018 WL 11432021, at *1 (E.D.N.Y. July 24, 2018) (describing

Seashore lands), *aff'd sub nom. Friends of Animals v. Romero*, 948 F.3d 579 (2d Cir. 2020).

FINS, a unit of the National Park Service ("NPS"), is the government agency responsible for

conserving and preserving Seashore lands.  16 U.S.C. § 459e-6.  To minimize the impact that

vehicles have on protected Seashore land, FINS may issue only a finite number of driving

permits on the island for vehicles engaging in designated purposes, such as construction and

business vehicles.  *See* 36 C.F.R. § 7.20(a)(3), (a)(6), (a)(8)(i); *see id.* § 7.20(a)(8)(ii)(E) ("No

more than 80 permits at any time are issued to construction and business vehicles.  An operator

of a construction or business vehicle who is denied a permit because the limit has been reached is

placed on a waiting list.").  Plaintiff has applied for and received several temporary driving

---

[2]  (Defs.' Mot. for Summ. J. ("Defs.' Mot."), Docket Entry No. 20; Defs.' Mem. of Law in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 22-1; Pl.'s Aff. in Opp'n to Defs.' Mot. ("Pl.'s Aff."), Docket Entry No. 21; Defs.' Reply Mem. in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 23.)

permits and, as of December of 2020, had been on the waiting list for a permanent permit "for a couple of years." (R. 97.)

### i. January to April of 2018 driving permits

In January of 2018, Plaintiff applied for a temporary driving permit to access Fire Island "[w]hen the bay freezes and the ferries do not run," which prevents his business from opening. (*Id.* at 1.) FINS issued Plaintiff two temporary driving permits as a "Construction/Business Vehicle." (*Id.* at 13–16.) The first permit was valid from January 10, 2018, through January 23, 2018, and the second permit was valid from February 14, 2018, through April 14, 2018. (*Id.*) The permits authorized Plaintiff "to travel across Fire Island National Seashore lands to transport workers, supplies, and materials from the mainland to Fire Island for work involved in the operation of a year round retail business when ferries and waterborne conveyances do not provide access." (*Id.* at 13; *see also id.* at 15.)

### ii. November of 2018 to April of 2019 driving permit

In October of 2018, Plaintiff again applied for a temporary driving permit to "continue to support the winter community as the ONLY food/grocery open to service the residents." (*Id.* at 17.) Plaintiff stated that Mermaid Market "[p]rovides year round service to the community and workers coming to work on the barrier island." (*Id.* at 20.) Plaintiff sought to be "open before the first ferry gets to the island to have coffee and breakfast items ready for workers coming over." (*Id.*) In addition, Plaintiff explained that "[v]endors will not deliver inventory to freight boat unless there is a minimum purchase," to which Mermaid Market cannot commit in the winter given low seasonal demand. (*Id.*)

FINS issued Plaintiff a temporary driving permit for the same area, valid from November 30, 2018, through April 16, 2019, but only for the hours between 6:00 AM to 9:00 AM and 4:00

3

PM to 6:00 PM.  (*Id.* at 21.)  The permit authorized Plaintiff "to travel across Fire Island

National Seashore lands to transport workers and supplies from the mainland to Fire Island for

work involved in the operation of the Mermaid Market when ferries and waterborne conveyances

do not provide access."  (*Id.*)

      On April 16, 2019, Plaintiff emailed FINS and asked for permission to drive through the

checkpoint outside the hours of his permit.  (*Id.* at 34–35.)  FINS granted Plaintiff's request for

April 16, 2019, only.  (*Id.* at 34.)  On April 18, 2019, Plaintiff emailed again, seeking permission

"to drive to the checkpoint outside the hours" of his permit.  (*Id.*)  An NPS employee responded

via email, stating:

> My understanding of your permit is so you can get to the Mermaid
> Market to be open before the first ferry arrives in Ocean Beach.  As
> you're requesting to drive in more of a residential manner that goes
> beyond what your temporary permit was issued for, so your request
> is denied.

(*Id.*)  The employee noted that ferries ran to and from Ocean Beach multiple times a day and

directed Plaintiff to utilize those for trips in between his permitted hours.  (*Id.* at 33.)

### iii.   October of 2019 to May of 2020 driving permit

      On or about October 16, 2019, Plaintiff applied for a temporary driving permit through

May 15, 2020, consistent with his residential lease.  (*Id.* at 37, 40.)  FINS requested that Plaintiff

pick a four-hour window in the afternoon for the permit in order "to run [his] business past the

last ferry" and to give Plaintiff "ample time to pick up [his] supplies and deliver them to [his]

business."  (*Id.* at 44.)  Taiani reiterated that Plaintiff's permit was "being issued to [him]

because [he] provide[s] a service to the community and it allows [him] to be open before the first

and last ferry" since "[y]ear round residents rely on [his] store."  (*Id.*)  After discussion, Plaintiff

and Defendants agreed to a temporary permit with driving privileges from 6:00 AM to 9:00 AM

and 2:00 PM to 6:00 PM.  (*Id.* at 43.)  FINS issued Plaintiff a temporary driving permit valid

from October 29, 2019, through May 15, 2020, with the agreed-upon access hours. (*Id.* at 47.) The permit authorized Plaintiff "to travel across Fire Island National Seashore lands to transport workers, supplies, and materials from the mainland to Fire Island for the work involved in the operation of the Mermaid Market when ferries and waterborne conveyances do not provide access." (*Id.*)

### iv.   Weekend-only permit issued to a similar business

In or around October of 2020, the owners of CJ's restaurant ("CJ's") in Ocean Beach requested a driving permit from Defendants. (*Id.* at 65–66.) FINS previously issued CJ's temporary permits in 2014 and 2015, which allowed full-week driving access. (*Id.* at 54.) CJ's "resolution with the Village of Ocean Beach" stated that CJ's must operate twelve months per year, and from November 1 to April 15 each year, CJ's "must provide essential food items including but not limited to milk, bread, [and] eggs provided that no other provider of the aforementioned food items is continually open for business during said period." (*Id.* at 52 (emphasis removed).) CJ's owner requested the driving permit to receive supplies and to transport workers outside of limited winter ferry hours. (*Id.* at 66.) After evaluating the business' "demonstrated need for access against the available waterborne transportation," FINS issued CJ's owner a temporary permit for weekends only until adequate ferry service resumed. (*Id.* at 56, 81.) In granting the permit, a FINS employee noted that the agency was realigning the permit program and intended to "work more closely with communities" to identify and meet community needs within regulations. (*Id.* at 56–57.)

### v.   December of 2020 to March of 2021 driving permit

On October 9, 2020, Plaintiff contacted FINS to obtain a temporary driving permit for the upcoming winter season. (*Id.* at 68–69.) Taiani notified Plaintiff of the temporary driving

permit FINS issued to CJ's owner, and that "[d]riving privileges will be consistent for both businesses and that will be the ability to drive on weekends only, because of inadequate ferry service," since "Ocean Beach has ferries running throughout the day with a 9 hour span on weekdays, [and] regulations require[] 8 hours to be adequate ferry service." (*Id.* at 79.)  Taiani further explained that previous temporary driving permits were granted "to meet essential needs of the community based on the information available at the time: that [Plaintiff] was the only business providing food and essential sundries to the community, particularly before and after the available ferry schedule." (*Id.* at 83.)  She noted that FINS had since become aware that other businesses provide "this service in the same and other nearby communities," (*id.* at 83, 111), and sought "to be consistent with the exceptions offered to all parties in similar circumstances," (*id.* at 83).  Plaintiff disputes this assertion and maintains that his store is the only grocery provider on the island.  (*Id.* at 17, 110, 121, 124.)

On December 9, 2020, FINS issued Plaintiff a temporary driving permit valid from December 12, 2020, through March 15, 2021, with the same driving privileges as the permit issued to CJ's owner.  (*Id.* at 81, 93, 106.)  The permit authorized Plaintiff "to travel across Fire Island National Seashore lands on weekends, for the purpose of transporting supplies and employees." (*Id.* at 106.)  Plaintiff accepted the permit "under protest."  (*Id.* at 108.)

### b.   Statutory and regulatory framework

In 1964, Congress enacted the Fire Island National Seashore Act, Pub. L. No. 88-587, which authorized the Secretary of the Interior (the "Secretary") to establish the Fire Island National Seashore.  16 U.S.C. § 459e(a).  The Seashore extends "from the easterly boundary of the main unit of Robert Moses State Park eastward to Moriches Inlet" and includes Fire Island. *Id.* § 459e(b).  Congress established FINS:

> For the purpose of conserving and preserving for the use of future generations certain relatively unspoiled and undeveloped beaches, dunes, and other natural features within Suffolk County, New York, which possess high values to the Nation as examples of unspoiled areas of great natural beauty in close proximity to large concentrations of urban population.

*Id*.  Maintaining minimal road traffic on Fire Island was a priority from FINS's inception.  *See United States v. Matherson*, 367 F. Supp. 779, 782 (E.D.N.Y. 1973) (describing the purpose of FINS), *aff'd*, 493 F.2d 1399 (2d Cir. 1974).

The Secretary is required to "administer and protect the Fire Island National Seashore with the primary aim of conserving the natural resources located there."  16 U.S.C. § 459e-6(a).  In carrying out this duty, "the Secretary may appoint subordinate officials and subdelegate to them the necessary power needed to perform the day to day operations of the National Seashore" and has delegated such power to the Superintendent of FINS.  *Matherson*, 367 F. Supp. at 781 (citations omitted).  "In providing for access to the island, the Superintendent shall require maximum possible reliance on those means of transportation which are other than private motor vehicles and which have the minimum feasible impact on Seashore lands."  36 C.F.R. § 7.20(a)(3).

The Superintendent is authorized to issue permits for motor vehicles whose travel is essential to "the management or enjoyment of Seashore resources," "the occupancy of residences," or "the ownership of real property on the island."  *Id.* § 7.20(a)(6).  When an applicant applies for a permit, the Superintendent "shall approve an application . . . with appropriate limitations and restrictions or deny the application" after considering:

> [T]he purposes of the Act in providing for the conservation and preservation of the natural resources of the Seashore and for the enjoyment of these resources by the public; the scope and purpose of such travel; the availability of alternative transportation on the day or days when the applicant for a permit requests to travel on Seashore lands; the present or past issuance of other permits to the

> applicant; [and] any limitations on numbers of permits established
> pursuant to paragraph (a)(8) . . . .

*Id.*  Permit applicants are divided into categories including year-round residents, part-time residents, reserved-rights holders, public utility and essential service vehicles, construction and business vehicles, municipal employees, and recreational vehicles.  *Id.* § 7.20(a)(8)(ii).  The Superintendent may limit the number of permits within each permit category and the total number of permits as necessary for resource protection, public safety, or visitor enjoyment.  *Id.* § 7.20(a)(8)(i).  For construction and business vehicles, "[n]o more than 80 permits at any time are issued."  *Id.* § 7.20(a)(8)(ii)(E).  "When the number of outstanding permits drops below 80, [waiting list] permits are issued in order of the date of receipt of the application."  *Id.*  "[W]hen water transportation is available, a . . . business shall accomplish all transportation of materials, supplies, and crews by use of the nearest available ferry, freight, or other overwater transportation method."  *Id.*

## II.  Discussion

### a.  Standard of review

"When a plaintiff seeks to 'hold unlawful and set aside agency action' under the APA, the district court essentially sits as an appellate tribunal, reviewing the administrative record compiled by that agency when it made the decision and determining whether . . . the agency's action was 'arbitrary, capricious, an abuse of discretion, [or] otherwise not in accordance with the law.'"  *Saleh v. Blinken*, No. 22-1168, 2023 WL 5091819, at *1 (2d Cir. Aug. 9, 2023) (first quoting 5 U.S.C. § 706(2)(A); then citing *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083–84 (D.C. Cir. 2001); and then citing *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997)); *see also Brezler v. Mills*, 220 F. Supp. 3d 303, 321 (E.D.N.Y. 2016) ("Where 'a party seeks review of agency action under the APA, the district judge sits as an appellate

tribunal,' and '[t]he entire case on review is a question of law.'" (quoting *Am. Bioscience*, 269 F.3d at 1083)); *Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015) (quoting same).  Thus, a summary judgment determination is "generally appropriate" in APA cases because "'[t]he question [of] whether an agency's decision is arbitrary and capricious . . . is a legal issue' amenable to summary disposition." *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (quoting *Citizens Against Casino Gambling v. Hogen*, No. 07-CV-451, 2008 WL 2746566, at *25 (W.D.N.Y. July 8, 2008)); *see also Saleh*, 2023 WL 5091819, at *1 ("It is generally acceptable for the district court to style such determinations [of whether an agency's action was arbitrary or capricious] as ones for summary judgment." (first citing *Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020); and then citing *Henley v. FDA*, 77 F.3d 616, 619 (2d Cir. 1996))).

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).  The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the

[nonmoving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant."  *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).

> **b.   Defendants' objections to Plaintiff's Affidavit**

Plaintiff failed to file a memorandum of law in opposition to Defendants' motion, and instead submitted two affidavits in opposition: one from Plaintiff ("Plaintiff's Affidavit") and one from Frank Fisher, a resident of Ocean Beach ("Fisher's Affidavit").  (*See* Pl.'s Aff.; Fisher's Aff. in Opp'n to Defs.' Mot. ("Fisher's Aff."), Docket Entry No. 21.)  Defendants argue that the Court should disregard the affidavits because Plaintiff failed to comply with Local Civil Rule 7.1(a) and because the Court should not consider facts beyond the administrative record. (Defs.' Reply 1.)

> **i.   Local Civil Rule 7.1(a) does not bar the Court from considering Plaintiff's Affidavit**

Defendants argue that Plaintiff failed to comply with Local Civil Rule 7.1(a) by submitting an affidavit rather than a memorandum of law, and the Court should therefore disregard Plaintiff's submission in its entirety.  (*Id.*)

"[A] district court has the inherent power to decide when a departure from its Local Rules should be excused or overlooked."  *Somlyo v. J. Lu-Rob Enters., Inc.*, 932 F.2d 1043, 1048 (2d Cir. 1991) (citations omitted), *superseded by rule on other grounds as recognized by Contino v. United States*, 535 F.3d 124, 127 (2d Cir. 2008); *see also In re Vivenzio*, No. 22-944, 2023 WL

2147600, at *2 (2d Cir. Feb. 22, 2023) (finding that "the bankruptcy court 'may modify or suspend the requirements' set forth in the local rules" (first quoting E.D.N.Y. Local Bankr. R. 1001-1(d); and then citing *Somlyo*, 932 F.2d at 1048)); *Phx. Glob. Ventures, LLC v. Phx. Hotel Assocs., Ltd.*, 422 F.3d 72, 74 (2d Cir. 2005) (extending "the inherent authority of a district court to overlook violations of, or depart from, its own local rules, to permit a district court . . . to overlook failures to comply with requirements of its electronic filing system" (citing *Somlyo*, 932 F.2d at 1048–49)); *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (noting that district courts have "broad discretion to determine whether to overlook a party's failure to comply with local court rules" (first citing *Wight v. BankAmerica Corp.*, 219 F.3d 79, 85 (2d Cir. 2000); and then citing *Somlyo*, 932 F.2d at 1048)), *abrogated on other grounds by Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167 (2009). The Second Circuit has also stated that "[i]f faced with potential unfairness, the district court should tailor the Local Rules to best achieve a just outcome." *Somlyo*, 932 F.2d at 1049.

The Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York require opposition papers to include a memorandum of law and supporting affidavits and exhibits, unless otherwise permitted by the court. S.D.N.Y. & E.D.N.Y. Local Civ. R. 7.1(a) (the "Local Rules") (requiring the memorandum of law to "set[] forth the cases and other authorities relied upon in support of the motion" and the supporting affidavits and exhibits to "contain[] any factual information and portions of the record necessary for the decision of the motion"). Courts have routinely excused noncompliance with Local Rules, including Local Rule 7.1(a). *See, e.g.*, *Riverbay Corp. v. Serv. Emps. Int'l Union, Local 32BJ*, No. 22-CV-10994, 2023 WL 3738984, at *1 n.1 (S.D.N.Y. May 31, 2023) (excusing the petitioner's violation of Local Civil Rule 7.1(a) under its inherent authority (citing *Somlyo*, 932

11

F.2d at 1048)); *Cotto v. Fed. Nat'l Mortg. Assoc.*, No. 20-CV-6487, 2021 WL 4340668, at *5 n.4

(S.D.N.Y. Sept. 22, 2021) (excusing the defendant's failure to file a memorandum of law under

Local Civil Rule 7.1(a) because the defendant's "supporting affirmation (albeit improperly)

include[d] an explanation of [the defendant]'s legal arguments seeking to dismiss the

[c]omplaint, with citations to applicable case law"); *Abdullah v. Travelers Ins. Co.*, No. 13-CV-

7825, 2014 WL 6807932, at *2 n.5 (S.D.N.Y. Oct. 28, 2014) (excusing the plaintiffs'

noncompliance with Local Rule 7.1(a) and considering the plaintiffs' arguments when they "did

not file a memorandum of law, . . . but rather made legal arguments in two attorney

declarations").

      Plaintiff's Affidavit makes arguments supported by facts in the administrative record.[3]

To the extent that Plaintiff addresses disputes of fact, they are also contained in the

administrative record.[4]  Therefore, the Court will consider Plaintiff's Affidavit,[5] despite

Plaintiff's noncompliance with the Local Rules.

---

[3]  For example, Plaintiff argues that the ferry schedule is unworkable for Plaintiff's business needs, (Pl.'s Aff. ¶¶ 23–33), and the ferry schedule is printed in detail in the administrative record, (*see, e.g.*, R. 23–25, 39, 51, 75).  Plaintiff also argues that contractors are granted permits to "drive back and forth" while FINS denied Plaintiff's permit to "simply drive on or off island once a day to keep [his] store open," (Pl.'s Aff. ¶ 35), which is reflected in the administrative record, (*see, e.g.*, R. 84 ("Why do you (the FINS) give preferential treatment to off island contractors to come and go[.]")).

[4]  For example, Plaintiff states that "there is no other place on Fire Island for its winter residents to get all the retail necessities for cooking and eating," (Pl.'s Aff. ¶ 7), an assertion that is found throughout the administrative record, (*see, e.g.*, R. 17, 72, 84, 110, 113, 121, 124).

[5]  The Court declines to consider the Fisher Affidavit as it attempts to introduce new information outside the administrative record.  (*See, e.g.*, Fisher's Aff. ¶ 5 (stating that CJ's "is a bar that serves food, not retail food supplies" and CJ's "do[es]n't sell any groceries" to contradict FINS' finding that CJ's provides staples like milk, bread, and eggs); *id.* ¶ 6 (stating that he "do[es] not recall a single instance where the market was not open until at least 4 or 5 p.m." to contradict FINS' finding that Plaintiff closed the store early on multiple occasions).)

  **ii. The APA does not bar the Court from considering Plaintiff's Affidavit**

   Defendants also argue that the APA limits the Court's review to the administrative record that was before the agency at the time it took the contested actions, and the Court should therefore disregard Plaintiff's Affidavit.  (Defs.' Reply 1, 3–5 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985)).)

   Under the APA's "record rule," "a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision."  *Nat'l Audubon Soc'y*, 132 F.3d at 14 (first citing *Fla. Power*, 470 U.S. at 743–44; and then citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)); *Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Harris v. Comm'r of Internal Revenue*, 748 F. App'x 387, 390 (2d Cir. 2018) (declining to consider additional documents submitted by the plaintiff because they were not part of the administrative record (citing *Nat'l Audubon Soc'y*, 132 F.3d at 14)); *HiFi DNA Tech LLC v. U.S. Dep't of Health & Hum. Servs.*, 357 F. App'x 345, 347 (2d Cir. 2009) (quoting *Nat'l Audubon Soc'y*, 132 F.3d at 14).  Courts in this Circuit have considered portions of a party's submissions that do not run afoul of the APA's record rule.  *See, e.g.*, *Farm Sanctuary v. U.S. Dep't of Ag.*, --- F. Supp. 3d ---, ---, 2023 WL 2673141, at *4 (W.D.N.Y. Mar. 28, 2023) (reviewing the parties' submissions regarding the plaintiff's statement of undisputed facts but noting that the "proper record before the [c]ourt in assessing the [c]ross-[m]otions for [s]ummary [j]udgment is contained in the revised administrative record"); *Vt. Pub. Int. Rsch. Grp. v. U.S. Fish & Wildlife Serv.*, 247 F. Supp. 2d 495, 516 (D. Vt. 2002) (finding no justification to strike the plaintiff's entire statement of undisputed material facts but declining to consider portions of the statement that were "argumentative and conclusory or include[d] information . . . outside the [APA's] record rule"); *see also SAI v. Trans. Sec. Admin.*, 315 F. Supp. 3d 218, 232 (D.D.C.

13

2018) (treating, for purposes of summary judgment in a FOIA case, a *pro se* plaintiff's forty-page affidavit as a brief in opposition because it contained more extensive legal and factual argument than did the plaintiff's five-page opposition brief); *Omoniyi v. Dep't of Homeland Sec.*, No. 10-CV-1344, 2012 WL 892197, at *1 n.1 (S.D.N.Y. Mar. 13, 2012) (considering, for purposes of a motion to dismiss in an INA case, a *pro se* plaintiff's affidavit because although titled as such, "it is not a sworn statement (or a declaration made under penalty of perjury), and is more aptly described as a memorandum").

As discussed above, Plaintiff's Affidavit makes arguments based on facts in the administrative record.  For example, Plaintiff argues that (1) Defendants' denial of a driving permit to Plaintiff in December of 2020 was "arbitrary and without sound reason or basis in the record or in law," (Pl.'s Aff. ¶¶ 19–41); (2) Defendants' assertion that Plaintiff had not used the permit properly is unsupported, (*id.* ¶¶ 42–47); and (3) Defendants' "treatment of similarly situated applicants" indicates the arbitrariness of their decision, (*id.* ¶¶ 48–55).  The Court will review Plaintiff's Affidavit for the arguments it makes based on the facts in the record and will not consider facts outside the administrative record.

### c.  Defendants' decision was not arbitrary and capricious

Defendants argue that their decision was neither arbitrary nor capricious because "FINS examined the relevant, most current information available and articulated a satisfactory explanation." (Defs.' Mem. 18.)  In support, Defendants argue that despite having issued Plaintiff a full-week driving permit for the previous winter seasons, in 2020, FINS learned three new pieces of information that "led it to reassess whether the issuance of a [full-week] winter driving permit to [Plaintiff] would benefit the Fire Island community." (Defs.' Reply 8.)  First, FINS learned that "Mermaid Market was not the sole source of groceries for residents in winter,"

(*id.*), as three markets on the mainland would deliver groceries to residents by ferry and another local business also sold basic provisions, (*see, e.g.*, R. 52, 59, 76, 83, 99, 111, 122, 139). Second, FINS learned that "Mermaid Market did not consistently operate according to its previously stated schedule," (Defs.' Reply 9; *see also* R. 83 (noting that Plaintiff "does not operate on a mandatory/fixed schedule, and at times closes early to get to his other job on the mainland")), based on "reports from community members and checkpoint records that showed [Plaintiff] traveling at times that were inconsistent with Mermaid Market's stated hours of operation," (Defs.' Reply 9; *see, e.g.*, R. 27–32, 68). Third, FINS learned that "the Fire Island Ferry's winter schedule provided an eight-hour window of time on weekdays between the arrival of the first ferry of the day and the departure of the last ferry of the day." (Defs.' Reply 9; *see also* Defs.' Mem. 18–19 (citing R. 64, 70, 75–76, 92).) In consideration of this new information, FINS aimed "to be consistent with the exceptions offered to all parties in similar circumstances and . . . match[ed] exceptions to the available waterborne transportation as defined in 36 CFR 7.20a." (R. 83.) Defendants argue that this new information justified FINS' decision to change Plaintiff's permit. (Defs.' Mem. 19; Defs.' Reply 9.) Defendants also argue that their decision was "evenhanded" and "did not discriminate," (Defs.' Mem. 19), because Plaintiff was "authoriz[ed] the same driving privileges . . . [as] another business that sells . . . basic food items," (R. 112), and because other permit holders received their permit through the permit waiting list, which Plaintiff was already on, (*id.* at 83).

Plaintiff argues that (1) Defendants applied an "arbitrary, unworkable and misleading rule"[6] when denying his driving permit, (Pl.'s Aff. ¶ 33; R. 110 (arguing that, because the current

---

[6] Plaintiff refers to this as the "eight-hour rule," which is codified at 36 C.F.R. § 7.20(a)(3)(ii).

ferry schedule restricts Mermaid Market's hours of operation, requiring Plaintiff to be limited to eight hours of access is arbitrary and that denial after two prior years of approval is arbitrary and capricious)); (2) Defendants' "creation or enforcement of a 'new [eight-hour] rule'" is arbitrary, capricious, and without merit because the "same ferry service existed when [D]efendants granted [Plaintiff] this permit for two consecutive years before," (Pl.'s Aff. ¶ 17; R. 85), and (3) Defendants allow other businesses driving permits and Plaintiff is "equally if not MORE deserving of the same permit," (R. 84; Pl.'s Aff. ¶¶ 52–53 ("I am serving the 11 un-serviced communities ON Fire Island, seeing dozens of locals who need grocery service each day. . . . Respectfully, I ask, who is providing a MORE essential service?").).

Section 706 of the APA allows a district court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat. Res. Def. Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Alzokari v. Pompeo*, 973 F.3d 65, 70–71 (2d Cir. 2020) (quoting *Nat. Res. Def. Council*, 658 F.3d at 215); *Citizens Against Casino Gambling in Erie Cnty. v. Chaudhuri*, 802 F.3d 267, 279 (2d Cir. 2015) (same). "The record must show that 'the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," revealing "a 'rational connection between the facts found and the choice made.'" *Nat. Res. Def. Council*, 658 F.3d at 215 (alterations in original) (quoting *Nat. Res. Def. Council, Inc. v. FAA*, 564 F.3d 549, 555 (2d Cir.

16

2009)); *FAA*, 564 F.3d at 555 (same) (quoting *State Farm*, 463 U.S. at 43); *see also Guertin v. United States*, 743 F.3d 382, 386 (2d Cir. 2014) (noting that the "record must show that the agency examined the relevant data and articulated a satisfactory explanation for its action" (quoting *Nat. Res. Def. Council*, 658 F.3d at 215)).  The court's task is not to "engage in an independent evaluation of the cold record," *Guan v. Gonzalez*, 432 F.3d 391, 394–95 (2d Cir. 2005), nor to substitute its judgment for that of the agency, *Nat. Res. Def. Council*, 658 F.3d at 215, but to determine whether the agency has "considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action," *J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 391 (2d Cir. 2000).

In addition, courts "will not disturb a factual finding if it is supported by reasonable, substantial and probative evidence in the record when considered as a whole." *Shao v. Mukasey*, 546 F.3d 138, 157–58 (2d Cir. 2008) (internal quotation marks and additional citation omitted) (quoting *Wu Biao Chen v. INS*, 344 F.3d 272, 275 (2d Cir. 2003)); *see also Ojo v. Garland*, 25 F.4th 152, 159–60 (2d Cir. 2022) ("[A court] uphold[s] the agency's factual findings if 'they are supported by reasonable, substantial and probative evidence in the record.'" (internal quotation marks omitted) (quoting *Yanqin Weng v. Holder*, 562 F.3d 510, 513 (2d Cir. 2009))); *Liang v. Garland*, 10 F.4th 106, 111 (2d Cir. 2021) (noting that a court is "required to uphold the agency's factual determinations so long as 'they are supported by reasonable, substantial[,] and probative evidence in the record'" (alteration in original) (quoting *Yanqin Weng*, 562 F.3d at 513)).  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d

Cir. 2010) (quoting *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d

Cir. 2003)).

      In an appeal of an administrative decision, the "[p]laintiff[] bear[s] the burden of showing

that an agency's actions are arbitrary and capricious by citation to evidence in the administrative

record." *Adueva v. Mayorkas*, No. 17-CV-3350, 2021 WL 3492144, at \*13 (E.D.N.Y. Aug. 9,

2021) (first citing *Boatmen v. Gutierrez*, 429 F. Supp. 2d 543, 548 (E.D.N.Y. 2006); and then

citing *Glara Fashion, Inc. v. Holder*, No. 11-CV-889, 2012 WL 352309, at \*6 (S.D.N.Y. Feb. 3,

2012)); *Miezgiel v. Holder*, 33 F. Supp. 3d 184, 189 (E.D.N.Y. 2014) (similar); *see also Yu v.

U.S. Dep't of Trans.*, 440 F. Supp. 3d 183, 196 (E.D.N.Y. Feb. 25, 2020) (noting that, in a case

reviewing an agency decision, "[t]he party challenging the decision has the burden of proof"

(first quoting *Coal. on W. Valley Nuclear Wastes v. Bodman*, 625 F. Supp. 2d 109, 116

(W.D.N.Y. 2007), *aff'd sub nom. Coal on W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306 (2d

Cir. 2009); and then citing *Miezgiel*, 33 F. Supp. 3d at 189)).

      FINS considered the pertinent evidence when it reviewed the Fire Island ferry schedule,

(R. 23–25, 39, 51, 62–63, 70, 75, 92), Mermaid Market's stated hours of operation, (*id.* at 3, 42,

67–68), the benefit to the public, (*see, e.g.*, *id.* at 76, 83, 99), and other facts ascertained by FINS

personnel, including the hours of operation of CJ's, the other business in Ocean Beach that sold

groceries to the public, (*id.* at 52, 64–66, 76, 79, 83, 99, 111–12), the availability of mainland

delivery services that would provide groceries to residents via the Fire Island ferry, (*id.* at 139

("Shop Rite in Bay Shore, King Kullen in Bay Shore, Pat's Market in East Islip and Sherry's

Market in Babylon are the only stores that we accept [grocery] delivery from."); *see also id.* at

76, 83, 99, 111, 122), and Plaintiff's use of his prior permits, (*id.* at 67–69; *see also* 27–32, 34,

43–44).

18

FINS examined the relevant regulatory factors when it evaluated "the purposes of the Act in providing for the conservation and preservation of the natural resources of the Seashore and for the enjoyment of these resources by the public," "the scope and purpose of [Plaintiff's] travel," "the availability of alternative transportation" on the days Plaintiff requested to travel, "the present or past issuance of other permits to [Plaintiff]," and "any limitations on numbers of permits."  36 C.F.R. § 7.20(a)(6).

First, FINS evaluated the purpose of the Act in providing for the conservation and preservation of the natural resources of the Seashore and the scope and purpose of Plaintiff's travel.  "Since 2018, [Plaintiff] was issued a discretionary permit to meet essential needs of the community based on the information available at the time[] that [Plaintiff] was the only business providing food and essential sundries to the community, particularly before and after the available ferry schedule."  (R. 83; *see also id.* at 47–50 (stating that the purpose of Plaintiff's permit is "to transport workers, supplies, and materials from the mainland to Fire Island for the work involved in the operation of the Mermaid Market when ferries and waterborne conveyances do not provide access"); *id.* at 99 ("[Plaintiff] received an exception because [FINS] thought he was the only business in town that supplied groceries to residents in the winter."); *id.* at 111–12 (informing Plaintiff that FINS "granted [him] the extra driving because at the time, [FINS] believed [he was] the only supplier of groceries and [was] essential to the community"); *cf. id.* at 33 (denying Plaintiff's request to drive outside his limited permit hours because he was "asking to use [his] temporary driving permit in more of a residential manner [which] [wa]sn't the purpose of [his] permit").)  After learning that residents had other options to obtain groceries in winter — including delivery from mainland markets via the Fire Island ferry, which "did not require any vehicle to drive over protected Seashore lands" — FINS determined that it should

19

issue Plaintiff a driving permit limited to weekends only to "help FINS meet its obligation to protect and conserve its natural resources."  (Defs.' Mem. 18; *see also* R. 76, 83).

Second, FINS evaluated the availability of alternative transportation.  Under 36 C.F.R. § 7.20, "alternative transportation" means "a waterborne conveyance that is licensed for hire and that provides a reasonable means of transportation between the mainland and the island."  36 C.F.R. § 7.20(a)(3).  Alternative transportation exists when (1) the transportation schedule permits departure from an island terminal before 9:00 AM and departure from a mainland terminal after 5:00 PM on the same day; (2) the interval between the earliest and latest service provided by the transportation service in question on any day exceeds eight hours, provided there is at least one round trip between the mainland and the island during that time; (3) the transportation terminal is no more than one mile from the point of origin or destination on the island; and (4) the mode of transportation is adequate to carry the person or object to be transported.  *Id.*  In deciding whether to issue Plaintiff a driving permit, FINS considered whether the ferry schedule would give Plaintiff an eight-hour window to operate Mermaid Market on weekdays.  (*See* Defs.' Reply 9; R. 79.)  FINS reviewed the ferry schedules, (*see, e.g.*, R. 62–63, 70, 75, 92), and concluded that the ferry schedules listed an interval of at least eight hours between the earliest and latest trips of the day as required by regulations, (*id.* at 76 ("The weekdays there is more than an 8 hour work day in the schedule but the weekends do not allow for 8 hours."); *id.* at 79 ("Ocean Beach has ferries running throughout the day with a 9 hour span on weekdays, . . . regulations require[] 8 hours to be adequate ferry service.")).  Thus, FINS determined that alternative transportation was available to Plaintiff on weekdays.

Third, FINS evaluated the past permits issued to Plaintiff and Plaintiff's use of these permits.  Although it issued Plaintiff a driving permit to allow him to operate Mermaid Market

and meet essential needs of the community during the winter, (*see, e.g.*, R. 47–50, 83, 111–12),

FINS "received multiple calls during the winter about [Plaintiff's] store not being open past 3:00

[PM]," and "many said that it was often closed at 1:00 [PM]," (R. 68; *see also id.* at 76 (noting

that Plaintiff "is someone who [FINS has] gotten many complaints about, saying he doesn't stay

open past 1:00 [PM] or he closes early because of inclement weather")).  When asked whether

Mermaid Market's hours had shortened, Plaintiff responded that he "never closed at one unless

[he] had some sort of doctors [sic] appointment which may have happened a total of 3 to 4 times

the whole winter."  (*Id.* at 67.)  He further explained that he worked a second job, which required

him to close at 3 PM no more than three times a week.  (*Id.*; *see also id.* at 42 (Plaintiff stating

that he sometimes has "to work [his] second job and [has] to be there by 3 [PM]"); *id.* at 43

(FINS noting that "it sounds like [Plaintiff] just want[s] this permit for the convenience of

getting to [his] second job"); *id.* at 34 (Plaintiff requesting to drive outside the hours of his

permit due, in part, to his second job); *id.* at 27–32 (checkpoint records showing that Plaintiff

often drove outside his permitted hours and during Mermaid Market's operating hours); *but see*

*id.* at 112 (Plaintiff stating that his "second job . . . will not be an issue this year").)  Based on

this information, FINS determined that Plaintiff "does not operate on a mandatory/fixed

schedule, and at times closes early to get to his other job on the mainland."  (*Id.* at 83.)

Fourth, FINS evaluated the limitations on the number of "construction and business

vehicle" permits established by the Superintendent.  Pursuant to 36 C.F.R. § 7.20, "[n]o more

than 80 permits at any time are issued to construction and business vehicles."  36 C.F.R.

§ 7.20(a)(8)(ii)(E).  Once FINS issues the maximum number of permits for a particular category,

it creates a waiting list, *id.*, and automatically adds applicants to the waiting list in the order

FINS received their initial application, (R. 97, 99).  Once a permit becomes available, the

applicant at the top of the list is issued the available permit.  (*Id.* at 99.)  Waiting list applicants are not automatically granted a temporary driving permit and must use "boats, ferries, bikes, and in some cases, walk[] to reach their jobs until a permit bec[omes] available."  (*Id.* at 83.)  At the time Plaintiff was denied a full-week driving permit, he was 15th on this waiting list.  (*Id.* at 114, 125, 143.)

In issuing Plaintiff a weekend-only driving permit, Defendants considered the relevant regulatory factors and concluded that (1) Mermaid Market was not the sole provider of groceries during the winter, (2) the Fire Island ferry provided adequate transportation for Plaintiff to operate Mermaid Market during weekdays, (3) Plaintiff's prior use of his permits did not align with Mermaid Market's operating hours, and (4) there were no permanent "construction and business vehicle" permits available.  Thus, the Court finds that FINS "articulated a satisfactory explanation for its action," *J. Andrew Lange*, 208 F.3d at 391, including a "rational connection between the facts found and the choice made," *Nat. Res. Def. Council*, 658 F.3d at 215.

Accordingly, the Court grants Defendants' motion for summary judgment.[7]

---

[7]  Because the Court grants Defendants' motion for summary judgment, the Court declines to address Defendants' additional argument that Plaintiff is not entitled to the relief requested, (*see* Defs.' Mem. 20–21), an "annual winter driving permit" without restriction, (Compl. 7.)

**III.   Conclusion**

For the reasons stated above, the Court grants Defendants' motion for summary

judgment.  The Clerk of Court is directed to close this case.

Dated: January 2, 2024
       Brooklyn, New York

                                   SO ORDERED:


                                   _____s/ MKB_____
                                   MARGO K. BRODIE
                                   United States District Judge